**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| CORY DRISCOLL, | : | |
| | : | |
| Plaintiff, | : | Case No. 3:22-cv-287 |
| | : | |
| v. | : | Judge Thomas M. Rose |
| | : | |
| MONTGOMERY COUNTY | : | |
| BOARD OF COMMISSIONERS, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

**ENTRY AND ORDER GRANTING, IN PART, AND DENYING, IN PART,
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. NO. 24)**

---

Presently before the Court is Defendants' Motion for Summary Judgment (the "Motion") (Doc. No. 24). Plaintiff Cory Driscoll ("Driscoll") has instituted this action against Defendants Montgomery County Board of Commissioners (the "County"), Montgomery County Sheriff Rob Streck in his personal capacity ("Sheriff Streck"), and Montgomery County Sheriff's Deputy Jennifer L. Smiley in her personal capacity ("Deputy Smiley") (collectively, "Defendants"). (Doc. Nos. 1 at PageID 2; 32 at PageID 451.[1]) Driscoll alleges a laundry list of civil rights violations pursuant to 42 U.S.C. § 1983 and Ohio state law, stemming from Deputy Smiley's use of deadly force against him in May 2020. (Doc. No. 1.) On summary judgment, Defendants argue Driscoll's claims related to Deputy Smiley's use of force must be dismissed because Deputy Smiley enjoys the benefit of qualified immunity under federal law and statutory immunity under Ohio law. (Doc. No 24. at PageID 264-69, 270-71.) Further, Defendants aver that Driscoll has failed to demonstrate

---

[1] By Stipulation (Doc. No. 32), the Parties have agreed to dismiss Driscoll's claims against the Montgomery County Sheriff's Office, Sheriff Streck in his official capacity, and Deputy Smiley in her official capacity.

1

an unconstitutional policy or custom sufficient to hold the County liable for the actions of Deputy Smiley. (*Id.* at PageID 269-70.) And, finally, Defendants submit that Driscoll's cause of action for violation of his right to free exercise of religion fails on its face. (*Id.* at PageID 269.) For the reasons discussed herein, the Court **GRANTS**, **IN PART**, and **DENIES**, **IN PART**, Defendants' Motion for Summary Judgment (Doc. No. 24).

## I.      <u>BACKGROUND</u>[2]

On May 10, 2020, a group of five individuals (the "Group") visited Possum Creek MetroPark in Montgomery County, Ohio. (Pl. Ex. 6, McNutt Interview, at 0:16-0:38.) The Group went to the park, initially intending to go hiking and search for an abandoned amusement park in the area. (*Id.*) Once in the MetroPark parking lot, they noticed a man, later identified as Driscoll, sitting in a car with his head down and loudly making noises that sounded like he was "rolling his R's." (Pl. Ex. 6, McNutt Interview, at 2:00-2:07; *see also* Doc. No. 22-8 at PageID 245.) Unbeknownst to the Group at the time, Driscoll has been diagnosed with schizoaffective disorder and bipolar disorder, and, he is susceptible to experiencing manic episodes that hinder his ability to control his movement, thinking, and communication. (Doc. No. 29-1 at PageID 304.) Also, Driscoll alleges that it is his religious practice to pray by "speaking in tongues," as he was doing in his car at Possum Creek MetroPark on May 10, 2020. (*Id.* at PageID 304-05.)

Driscoll's behavior made the Group feel uneasy, so they walked away from the parking lot and hiked in another area of the park. (Pl. Ex. 6, McNutt Interview, at 2:15-2:20.) All told, about an hour after they arrived at Possum Creek MetroPark, the Group finally returned to the parking lot to find Driscoll still in his car, making the same noises as before. (*Id.* at 2:21-2:42.) The Group then assumed Driscoll to be in crisis. (*Id.* at 2:44-2:50.) They approached Driscoll's car to offer

---

[2] Herein, the Court refers directly to the Parties' exhibits by name where such exhibits have been manually filed. Notice of the Parties' manual filings with the Court may be found at Doc. Nos. 23 and 30.

him their assistance, but Driscoll ignored them. (*Id.* at 2:55-3:03.)

Out of concern for Driscoll, one young woman in the Group, Marisah Roberts ("Ms. Roberts"), contacted the Montgomery County Regional Dispatch Center ("Dispatch") non-emergency line to try and get Driscoll help. (Pl. Ex. 5-A, First Dispatch Call, at 1:20-1:25; Pl. Ex. 6, McNutt Interview, at 3:48-3:53.) Ms. Roberts told Dispatch about Driscoll's behavior, as described above, and advised that Driscoll was not okay. (Pl. Ex. 5-A, First Dispatch Call, at 1:26-1:44, 2:50-3:00, 3:10-3:20.) When asked if Driscoll had any weapons, Ms. Roberts stated that she did not see any weapons, but that she might have seen a lighter in Driscoll's car. (*Id.* at 3:32-4:00.)

Meanwhile, Driscoll exited his car and walked onto a hiking trail toward a nearby lake. (*Id.* at 1:46-2:34.) At this time, Driscoll carried with him an empty one-gallon water jug. (*Id.* at 2:34-2:36.) Driscoll alleges that he was thirsty and decided to leave his car to fill his jug with water from the lake. (Doc. No. 29-1 at PageID 305.) Ms. Roberts kept speaking with Dispatch and the remainder of the Group followed Driscoll just closely enough to keep eyes on him. (Pl. Ex. 5-A, First Dispatch Call, at 5:45-6:04.) However, the Group lost sight of Driscoll behind some bushes as he reached the lake. (Pl. Ex. 6, McNutt Interview, at 3:20-3:30.) Nonetheless, the Group could still hear Driscoll making the same loud noises he had been making since they arrived at Possum Creek MetroPark. (*Id.*) While Driscoll was away from his vehicle, Dispatch reported the incident and called for an available unit to respond. (Defs. Ex. 10, Radio.wav, at 0:00-0:06; *see also* Doc. No. 22-8 at PageID 242-45.)

Enter, Deputy Smiley. Deputy Smiley has been a Montgomery County Sheriff's Deputy since December 22, 2001. (Doc. No. 22-1 at PageID 103.) Over the years, the Montgomery County Sheriff's Office ("MCSO") has required Deputy Smiley to complete various training modules on topics such as the use of force, legal updates, ethics, and dealing with mental illness.

(*See* Doc. No. 22-3 at PageID 107-25.) Throughout the last decade, Deputy Smiley has generally completed her training successfully, earning 381 training credits out of a possible 396.5 total training credits. (*Id.* at PageID 125.) In addition, Deputy Smiley has continually acknowledged her receipt of MCSO policies, which include extensive provisions regarding the use of force and handling individuals suffering from mental illness. (*See* Doc. Nos. 22-4 at PageID 129-30, 159; 22-5; 22-6.)

On May 10, 2020, Deputy Smiley was on duty, patrolling the Jefferson Township area. (Doc. No. 22-1 at PageID 103-04.) When Dispatch called for an officer to investigate Driscoll's behavior, Deputy Smiley was only a short distance away from Possum Creek MetroPark. (Defs. Ex. 10, Radio.wav, at 1:05-1:10.) She picked up the call and began driving to the MetroPark parking lot. (*Id.*) As Deputy Smiley was en route, Dispatch forwarded to her in-car computer the information that Ms. Roberts had provided. (Doc. No. 22-1 at PageID 105; *see also* Doc. No. 22-8 at PageID 245.) Deputy Smiley quickly made it to the Possum Creek MetroPark parking lot and located Driscoll's unoccupied car based on the description in Dispatch's incident report. (Doc. No. 22-7 at PageID 240.) She got out of her MCSO police cruiser and, after being unable to read Driscoll's temporary license plate, checked the vehicle identification number for Driscoll's car. (Defs. Ex. 10, Radio.wav, at 2:48-2:52.)

Driscoll emerged from the hiking trail and returned to the MetroPark parking lot, gallon jug in hand, where he was confronted by Deputy Smiley. (Pl. Ex. 6, McNutt Interview, at 6:23-6:40.) Deputy Smiley approached Driscoll and ordered him to put his jug down. (Defs. Ex. 10, Incident Video, at 0:00-0:37.) At this point, Driscoll's water jug was filled with discolored lake water and Deputy Smiley believed the jug was filled with gasoline. (Doc. No. 22-1 at PageID 105.) Driscoll did not immediately comply with Deputy Smiley's order. (Defs. Ex. 10, Incident

4

Video, at 0:00-0:37.) Instead, he drank from the jug and continued to make loud noises. (*Id.*)

In short order, Deputy Smiley drew her firearm and held Driscoll at gunpoint. (*Id.* at 0:37-0:39.) Driscoll responded by tossing his water jug aside, stretching out his now-empty hands at his sides, and taking several steps toward Deputy Smiley while continuing to speak in tongues. (*Id.*) Deputy Smiley ordered Driscoll to stop coming toward her and he complied. (*Id.* at 0:40-0:46.) Driscoll was not compliant with Deputy Smiley's following order to get on the ground. (*Id.* at 0:46-1:20.) Still aiming her weapon at Driscoll, Deputy Smiley repeatedly ordered Driscoll to get on the ground to no avail. (*Id.*) Driscoll took a number of steps backward and picked up his water jug. (*Id.* at 1:20-1:22.) Deputy Smiley followed behind him. (*Id.*) Driscoll began drinking from the jug and dumping out its contents in between swigs. (*Id.* at 1:22-1:37.) Deputy Smiley contacted Dispatch on her radio and requested a medic because she believed Driscoll to be drinking gasoline. (Defs. Ex. 10, Radio.wav, at 4:05-4:10.) However, on balance, one witness from the Group, Thomas McNutt, observed that Driscoll was pouring out the contents of his jug to show Deputy Smiley that it was only water. (Pl. Ex. 6, McNutt Interview, at 8:20-8:30.)

As he drank from his jug, Driscoll again took several of steps toward Deputy Smiley. (Defs. Ex. 10, Incident Video, at 1:22-1:37.) With her gun drawn, Deputy Smiley warned that if Driscoll took another step toward her, she would shoot him. (*Id.* at 1:37-1:39.) Driscoll stopped in his tracks, but failed to comply with Deputy Smiley's consistent demand that he get on the ground. (*Id.* at 1:39-2:20.) After a brief time, Driscoll threw his water jug to the side, outstretched his arms at his sides, and said, "shoot me." (*Id.* at 2:20-2:22.) He also stepped toward Deputy Smiley as he resumed speaking in tongues. (*Id.* at 2:22-2:25.) Driscoll then stepped back again, picked up his jug, and said, with arguably inquisitory inflection, "I'm drinking gasoline." (*Id.* at 2:25-2:27.)

This sort of back-and-forth interaction continued between Driscoll and Deputy Smiley for another minute or so.  (*Id.* at 2:27-3:30.)  The incident finally came to an end when—although Driscoll was stationary—Deputy Smiley warned that if Driscoll took a step toward her, she would shoot him.  (*Id.* at 3:30-3:34.)  Driscoll responded, saying, "shoot me then."  (*Id.*)  With his arms again stretched out at his sides, Driscoll took two strides toward Deputy Smiley.  (*Id.* at 3:34-3:35.)  Believing Driscoll to be covered in gasoline and in possession of a lighter, Deputy Smiley assumed that Driscoll might attempt to light himself or her on fire once he reached her.  (Doc. No. 22-1 at PageID 105.)  From the close range, Deputy Smiley fired her weapon, shooting Driscoll in the abdomen, and Driscoll immediately dropped to the ground.  (Defs. Ex. 10, Incident Video, at 3:35-3:40.)  The entire confrontation between Driscoll and Deputy Smiley lasted only about three-and-a-half minutes.  (*See* Defs. Ex. 10, Incident Video.)  Driscoll ultimately survived after being treated for the gunshot wound at Premier Health Miami Valley Hospital.  (Doc. No. 29-7.)

Following the incident, the MCSO began an internal investigation into the officer-involved shooting.  (*See* Doc. No. 29-11 at PageID 349.)  Immediately after the shooting, MCSO investigators were called onto the scene.  (*Id.* at PageID 336-40, 342, 349.)  The members of the Group, who witnessed the incident, were separated and interviewed individually.  (*Id.* at PageID 338-40, 342-43, 349.)  The Group members each gave consistent accounts of the shooting and provided written witness statements.  (Doc. No. 29-4 at PageID 312-18.)  Investigators collected evidence on the scene, including a video recording of the incident, the contents of Driscoll's water jug, Driscoll's clothes which had been cut off him when paramedics arrived, and the bullet casing from Deputy Smiley's pistol.  (Doc. No. 29-11 at PageID 336, 338.)

In the coming days, investigators identified Driscoll, executed a search warrant on Driscoll's vehicle, took aerial photos of the scene, and submitted physical evidence from the scene

for forensic testing. (Doc. Nos. 22-9 at PageID 248-50; 29-11 at PageID 336-37, 340-41, 345-48.) Deputy Smiley herself was interviewed by an MCSO investigator in the presence of her union attorney on May 12, 2020, and she authored a written statement on May 13, 2020. (Doc. Nos. 22-7 at PageID 240-41; 29-11 at PageID 347-48.) A local grand jury later heard evidence related to Deputy Smiley's use of deadly force and, on June 30, 2020, returned no true bill of indictment. (Doc. No. 29-16 at PageID 367.) The MCSO's internal investigation resulted in a similar determination, finding that Deputy Smiley's use of lethal force comported with MSCO policies for proper conduct. (*Id.* at PageID 371-72.)

Driscoll brought the instant action on October 7, 2022, alleging the following seven causes of action: Counts I and II of the Complaint (Doc. No. 1) collectively allege that, under color of state law, Defendants effectuated the use of excessive force on Driscoll, in violation of the Fourth and Fourteenth Amendments of the United States Constitution (Doc. No. 1 at PageID 4-6); Count III alleges that Deputy Smiley deprived Driscoll of his right to free exercise of religion, in violation of the First Amendment of the United States Constitution (*Id.* at PageID 6); Count IV alleges that the County failed to adequately train its officers such that the County is liable for Deputy Smiley's use of excessive force (*Id.* at PageID 6-7); Count V alleges that the County maintained an unconstitutional policy or custom which resulted in Deputy Smiley's use of excessive force (*Id.* at PageID 7-8); Count VI alleges that Deputy Smiley subjected Driscoll to a false arrest, in violation of Ohio state law (*Id.* at PageID 8); Count VII alleges a claim for battery against Deputy Smiley pursuant to Ohio state law (*Id.* at PageID 9); and, Count VIII alleges a state law claim against Deputy Smiley for infliction of severe emotional distress (*Id.*).

Defendants filed the present Motion on July 31, 2024. (Doc. No. 24.) Driscoll filed Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment (the

"Response") (Doc. No. 29) on September 11, 2024, and Defendants filed Defendants' Reply in Support of Motion for Summary Judgment (the "Reply") (Doc. No. 33) on October 4, 2024. In their Reply, Defendants raised several evidentiary objections aimed at Driscoll's Response. (Doc. No. 33 at PageID 453-55.) In light of these objections, the Court permitted Driscoll to submit a sur-reply for the limited purpose of addressing Defendants' evidentiary arguments. (Doc. No. 36.) Driscoll timely filed his sur-reply on October 22, 2024. (Doc. No. 37.) The current Motion is now ripe for review and decision.

## II.  <u>STANDARD OF REVIEW</u>

Rule 56 of the Federal Rules of Civil Procedure provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought" and that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, affidavits or sworn declarations, and admissions on file, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* Fed. R. Civ. P. 56(a), (c).

The burden then shifts to the non-moving party, which "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In opposing summary judgment, the nonmoving party cannot rest on its pleadings or merely reassert its previous allegations. *Id*. at 248-49. It also is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must "go beyond the

[unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

A party's failure "to properly address another party's assertion of fact as required by Rule 56(c)" can result in the court "consider[ing] the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e). Additionally, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 255. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id*. at 255; *Matsushita*, 475 U.S. at 587; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id*. The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id*.

### III.   ANALYSIS

#### A.   Evidentiary Objections

As a preliminary matter, the Court must resolve Defendants' objections to the evidence relied upon in Driscoll's Response. With his Response, Driscoll submitted nineteen exhibits for the Court's consideration and Defendants contend that eight of those exhibits constitute

impermissible hearsay evidence.  (Doc. No. 33 at PageID 454-55.)  Specifically, Defendants claim that the following exhibits are inadmissible hearsay and should not be considered by the Court for purposes of summary judgment: handwritten witness statements, offered as Plaintiff's Exhibit 4; the recording of the call that Ms. Roberts made to Dispatch on May 10, 2020, offered as Plaintiff's Exhibit 5; the recorded witness interview of Thomas McNutt, offered as Plaintiff's Exhibit 6; an MCSO press release concerning the officer-involved shooting here, offered as Plaintiff's Exhibit 9; online news articles reporting on the shooting, offered as Plaintiff's Exhibit 10; the narrative reports of MCSO investigators prepared in the course of conducting an internal investigation into Deputy Smiley's officer-involved shooting, to the extent those reports contain the statements of non-party witnesses, offered as Plaintiff's Exhibit 11; Statements made by MCSO Detective Brian Shiverdecker and Deputy Smiley's union attorney when conducting Deputy Smiley's interview, which has been offered as Plaintiff's Exhibit 14; and, the statements of Defendants' counsel regarding discovery, which have been offered as Plaintiff's Exhibit 15.  (*Id.*)

Driscoll, on the other hand, argues that Defendants have attacked his evidence using an inapt analysis.  (Doc. No. 37 at PageID 489.)  Driscoll posits that, on a motion for summary judgment, his evidence need not be presented in admissible form so long as the contents of the evidence could be presented in admissible form at trial.  (*Id.* at PageID 490.)  In support of this contention, Driscoll has responded to each of Defendants' individual objections by articulating his bases for the admissibility of the contents of his exhibits at trial.  (*Id.* at PageID 490-95.)

Generally, Fed. R. Civ. P. 56 requires that a party asserting a genuine dispute of material fact must support their assertion by "citing to particular parts of materials in the record ...."  Fed. R. Civ. P. 56(c)(1).  Though a party's "proffered evidence need not be in admissible *form*, [] its *content* must be admissible."  *Bailey v. Floyd Cnty. Bd. of Educ. By & Through Towler*, 106 F.3d

135, 145 (6th Cir. 1997) (citing *Celotex*, 477 U.S. at 324) (*emphasis in original*).  Rule 56 further provides that a party may object to his adversary's cited materials on the ground that the contents of the materials "cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  "Once an objection is properly made, the proponent must 'show that the material is admissible as presented or ... explain the admissible form that is anticipated.'"  *Magnum v. Repp*, 674 F. App'x. 531, 536 (6th Cir. 2017) (quoting Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment)).

Pertinently, hearsay is inadmissible unless otherwise permitted by federal statute, the Federal Rules of Evidence, or some other rule stated by the Supreme Court.  Fed. R. Evid. 802. By this token, it is axiomatic that inadmissible hearsay consists of an out-of-court statement being offered to prove the truth of the matter asserted therein.  Fed. R. Evid. 801(c).

With this framing, the Court ultimately finds Defendants' evidentiary objections here insufficient to disregard materials Driscoll cited in opposition to summary judgment outright. Defendants argue—sometimes rightly—that Driscoll's materials, identified above, constitute inadmissible hearsay in their current form.  (Doc. No. 33 at PageID 453-55.)  However, Defendants do not challenge whether Driscoll's evidence could possibly be presented in a form that would render the exhibits inadmissible at trial.  Indeed, the majority of Driscoll's evidence to which Defendants raise objection, such as the content of the recorded witness interview of civilian witness Thomas McNutt, could be properly admitted at trial by direct or supplemental testimony, if not subject to an exception to the general rule against hearsay.  Other evidence cited by Driscoll clearly falls within an exception to the hearsay rule at first glance.  For example, Plaintiff's Exhibit 5, a recording of Ms. Roberts' first call to Dispatch, represents an unequivocal present sense impression, exempted from the hearsay rule by Fed. R. Evid. 803(1).  In any event, because

11

Defendants do not contend that the contents of Driscoll's evidence could not be presented in any admissible form at trial, Defendants' evidentiary objections are for naught at the summary judgment phase.  Hence, the Court finds that Defendants' evidentiary objections are not well-taken in this Motion.

### B. **The Merits**

Turning to the merits of Defendants' Motion, Driscoll's claims in this matter can be separated into two broad categories: Driscoll's claims under federal law, and, Driscoll's claims arising under Ohio state law.

### 1. **Federal Claims**

In this action, Driscoll has brought multiple claims against Defendants under 42 U.S.C. § 1983.  (Doc. No. 1 at PageID 4-8.)  As a rule, 42 U.S.C. § 1983 "does not create any substantive rights but rather merely provides remedies for deprivations of rights established elsewhere." *Sample v. Bailey*, 409 F.3d 689, 695 (6th Cir. 2005) (citation and internal quotation marks omitted). A plaintiff, such as Driscoll, may only succeed on a § 1983 claim by demonstrating "that a person acting under color of state law deprived [him] of a right secured by the Constitution or laws of the United States."  *Sample*, 409 F.3d at 695 (quoting *Waters v. City of Morristown*, 242 F.3d 353, 358-59 (6th Cir. 2001)) (alteration in original) (internal quotation marks omitted).  To that end, Driscoll alleges that Defendants subjected him to excessive force when Deputy Smiley shot him on May 10, 2020, in violation of the Fourth and Fourteenth Amendments of the United States constitution (Doc. No. 1 at PageID 4-6); that Defendants violated his right to free exercise of religion, in violation of the First Amendment of the United States Constitution (*Id.* at PageID 6); and, that the County is liable for its officer's alleged constitutional violations due to a failure to train and the promulgation of unconstitutional policies or customs which resulted in the alleged

violations of Driscoll's constitutional rights (*Id.* at PageID 6-8). The Court considers each alleged constitutional violation in turn.

### 1. <u>Excessive force</u>

As a point of order, the Court first notes that Driscoll has improperly alleged in Counts I and II of the Complaint that Sheriff Streck and the County subjected him to excessive force on May 10, 2020. In essence, Driscoll's claims seek to hold Sheriff Streck and the County liable for the actions of Deputy Smiley. Yet, § 1983 does not impose such vicarious liability. *Monell v. Dep't. of Soc. Servs. Of City of New York*, 436 U.S. 658, 692 (1978). Rather, plaintiffs must be able to establish that the actions of a tortfeasor's superiors caused the alleged tort at issue. *Id.*

In short, neither Sheriff Streck nor the County shot Driscoll. There is no evidence to suggest that Sheriff Streck may otherwise be held liable for Deputy Smiley's use of force. Sheriff Streck only remains as a party to this litigation in his personal capacity and, in his personal capacity, Sheriff Streck's sole connection to this case is that he was sheriff at the time the May 10 incident occurred. (Doc. No. 32.) Further, the County cannot be found liable on Counts I and II of the Complaint because § 1983 will not allow vicarious liability for the actions of Deputy Smiley. The County may only be found liable for Deputy Smiley's use of force, (a) if that use of force was unconstitutional, and, (b) if the County maintained an unconstitutional policy or custom that resulted in Deputy Smiley's use of force to begin with. *Monell*, 436 U.S. at 694. Although Driscoll does appropriately allege the County's liability in Counts IV and V of the Complaint, Driscoll's allegations against the County may not stand with respect to Counts I and II. Therefore, the Court **DISMISSES** Counts I and II of the Complaint to the extent that they allege the use of excessive force by Sheriff Streck and the County.

With respect to Deputy Smiley herself, however, the Court must turn to the substance of Defendants' Motion. Defendants do not dispute that Deputy Smiley acted under color to state law to use deadly force on Driscoll. Instead, Defendants contend that Deputy Smiley is entitled to federal qualified immunity from suit for her actions on May 10, 2020. (Doc. No. 24 at PageID 264.) Qualified immunity is a doctrine that shields state actors "'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This doctrine serves to "hold public officials accountable when they exercise power irresponsibly," while protecting "officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231.

Once a defendant has invoked qualified immunity, "'the ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity.'" *Palma v. Johns*, 27 F.4th 419, 427 (6th Cir. 2022) (quoting *Estate of Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017)). A plaintiff may only meet his burden and overcome a defendant's claim to qualified immunity where he can show that: "(1) the defendant violated a constitutional right; and (2) the right was clearly established." *Puskas v. Delaware Cnty., Ohio*, 56 F.4th 1088, 1093 (6th Cir. 2023) (quoting *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021)) (internal quotation marks omitted). If, viewing the facts in the light most favorable to the plaintiff, either of these two prongs cannot be established, the defendant is entitled to qualified immunity. *Mitchell v. Schlabach*, 864 F.3d 416, 420 (6th Cir. 2017) ("Government officials are protected by the doctrine of qualified immunity unless the answer to both questions is yes").

### a.  **Constitutional violation**

Defendants argue that Deputy Smiley's use of lethal force during the May 10, 2020, incident did not violate Driscoll's constitutional rights.  (Doc. No. 24 at PageID 264.)  More specifically, Defendants claim that Deputy Smiley's use of force was objectively reasonable because a reasonable officer in her position would have perceived Driscoll to pose an imminent threat of serious physical harm.  (*Id.* at PageID 265.)  The key to Defendants' assertion that Deputy Smiley's conduct was objectively reasonable is the contention that Deputy Smiley reasonably believed Driscoll's water jug was filled with gasoline.  (*Id.* at PageID 266.)  Under Defendants' theory, if Deputy Smiley reasonably believed Driscoll to be in possession of gasoline, then it was also reasonable to fear that Driscoll might "inflict serious physical harm through ignition by gasoline" when he began to stride toward Deputy Smiley.  (*Id.* at PageID 267-68.)  Because Deputy Smiley's use of lethal force was objectively reasonable in light of the circumstances, Defendants say, no unlawful seizure occurred under the Fourth Amendment.  (*Id.* at PageID 268.)

For his part, Driscoll avers Deputy Smiley had no cause to perceive him as such a dangerous threat to justify her use of lethal force on May 10, 2020.  (Doc. No. 29 at PageID 296-97.)  Driscoll points to record evidence, available to Deputy Smiley at the time, which would have indicated to Deputy Smiley that Driscoll's jug was not in-fact filled with gasoline.  (*Id.* at PageID 296.)  Additionally, Driscoll submits that he was not behaving threateningly when Deputy Smiley made the decision to fire her weapon at him.  (*Id.*)  To the contrary, Driscoll's account of his interaction with Deputy Smiley identifies Deputy Smiley herself as the escalating party.  (*Id.* at PageID 297.)  Finally, Driscoll claims that Deputy Smiley should have realized Driscoll was suffering a mental health crisis and tempered her approach accordingly.  (*Id.*)  Regardless, Deputy

Smiley had other means of exercising force that might have been more apt and less lethal given the circumstances. (*Id.*)

Courts typically draw upon the Fourth Amendment when determining whether a law enforcement officer has subjected a person to excessive force. *See e.g.*, *Graham v. Connor*, 490 U.S. 386, 394 (1989); *see also Palma*, 27 F.4th at 428 (quoting *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015)). The Fourth Amendment ubiquitously protects individuals from unreasonable searches and seizures. U.S. CONST. AMEND. IV. It is also well established that an officer's use of force constitutes a seizure, as contemplated by the Fourth Amendment. *See e.g.*, *Tennessee v. Garner*, 47 U.S. 1, 7 (1985). Against this backdrop, an officer's use of force will not be considered constitutional unless that use of force was reasonable. *Stewart v. City of Euclid*, 970 F.3d 667, 672 (6th Cir. 2020) ("Thus, to be constitutional, [the use of force] must be reasonable").

The reasonableness of an officer's use of force depends on an objective analysis conducted "'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Thomas v. City of Columbus, Ohio*, 854 F.3d 361, 365 (6th Cir. 2017) (quoting *Graham*, 490 U.S. at 396). "Police officers routinely face tense, uncertain, and rapidly evolving situations that force split-second judgments about the degree of force required" in a given instance. *Reich v. City of Elizabethtown, Ky.*, 945 F.3d 968, 978 (6th Cir. 2019) (citation and internal quotation marks omitted). As such, courts assessing an excessive force claim must be especially mindful of the totality of the circumstances the officer "faced at the time [she] decided to use force." *Thomas*, 854 F.3d at 365 (citing *Livermore v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007)). This does not require a court to "accept the officer's subjective view of the facts when making this assessment." *Palma*, 27 F. 4th at 428 (citation and internal quotation marks omitted). Instead, courts must evaluate the totality of the circumstances based "'only [on] the facts that were

knowable to the defendant officer[].'" *Reich*, 945 F.3d at 979 (quoting *White v. Pauly*, 580 U.S. 73, 77 (2017)).

The totality of the circumstances in any given matter will only justify an officer's use of deadly force "in rare instances." *Sample*, 409 F.3d at 697 (quoting *Whitlow v. City of Louisville*, 39 F. App'x. 297, 302-03 (6th Cir. 2002)) (internal quotation marks omitted). In particular, an officer may only use deadly force where she "has probable cause to believe the suspect poses a threat of serious physical harm, either to [herself] or to others …." *Garner*, 471 U.S. at 11. To be sure, "the threat of immediate harm is a 'minimum requirement for the use of deadly force.'" *Puskas*, 56 F.4th at 1096 (quoting *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005)).

The Sixth Circuit in *Palma* has crafted a non-exhaustive list of factors for courts to consider when determining whether an officer reasonably believed a person to pose an imminent risk of serious physical harm. *Palma*, 27 F.4th at 432. To wit, they are:

> (1) why the officer was called to the scene; (2) whether the officer knew or reasonably believed that the person was armed; (3) whether the person verbally or physically threatened the officer or disobeyed the officer; (4) how far the officer was from the person; (5) the duration of the entire encounter; (6) whether the officer knew of any ongoing mental or physical health conditions that may have affected the person's response to the officer; and (7) whether the officer could have diffused the situation with less forceful tactics.

*Id.* (internal citations omitted).

Returning then to the matter at hand, the Court finds that, on balance, a reasonable jury could determine that Deputy Smiley acted unreasonably when she shot Driscoll on May 10, 2020. When she was called to Possum Creek MetroPark, Deputy Smiley was not responding to a criminal matter, but to a mere suspicious person report. (*See* Doc. No. 20-8.) Although Deputy Smiley had no way to know that the Group had called Dispatch because they were worried for Driscoll, there is no evidence indicating that Deputy Smiley had cause to believe she would have to address

17

criminal activity when she arrived at the MetroPark parking lot. *Palma*, 27 F. 4th at 432 ("When officers are called for wellness checks or other non-criminal calls, this [c]ourt looks at what the officer learned and observed about the situation before the officer even engaged with anyone on the scene") (citations omitted). Once Deputy Smiley engaged with Driscoll, he did not verbally or physically threaten her. Although the Court will not begrudge Deputy Smiley's planning, it bears acknowledging that, viewing the facts in the light most favorable to Driscoll, Deputy Smiley appeared to be the aggressor during the May 10 incident. She unholstered her firearm almost immediately upon encountering Driscoll. (Defs. Ex. 10, Incident Video, at 0:37-0:39.) Deputy Smiley's only apparent reason for drawing her gun was Driscoll's non-compliance with her orders, but non-compliance alone will not reasonably evidence a threat of serious physical harm. *Palma*, 27 F.4th at 934 ("the mere failure of a citizen—not arrested for any crime—to follow the officer's commands does not give a law enforcement official authority to … use lethal force against him") (internal citation and quotation marks omitted).

To her credit, even construing the facts in Driscoll's favor, Deputy Smiley was forced to act quickly on May 10, 2020. Without the benefit of hindsight, Deputy Smiley faced Driscoll from the small distance of just a few feet over the limited course of three-and-a-half minutes. *Mitchell*, 864 F.3d at 423 ("The fact that a situation 'unfolds quickly' is not alone sufficient to justify the application of deadly force, but it is a factor that weighs in favor of a finding of reasonableness …"). Moreover, in those circumstances, Deputy Smiley could not be expected to holster her weapon once she drew it. She selected her preferred tool and she might have been subjected to greater risk if she decided to switch to a different one. Yet, Deputy Smiley did not necessarily have cause to actually subject Driscoll to lethal force by shooting him in the torso. Again, Driscoll was not particularly threatening toward Deputy Smiley or anyone else. He was behaving

18

erratically and a reasonable officer might have ascertained that Driscoll was in a precarious mental state which would not be best addressed with deadly force.

In truth, Deputy Smiley's claim to qualified immunity on this prong turns on whether she reasonably believed Driscoll to be in possession of gasoline (i.e., a weapon). Deputy Smiley certainly had good reason to believe that Driscoll had a lighter in his car based on Dispatch's incident report. (Doc. No. 22-8 at PageID 245.) Nevertheless, by virtue of that same incident report, Deputy Smiley should have known that prior to her arrival Driscoll took a "big water jug" to a nearby pond. (*Id.*) The only evidence that Deputy Smiley was told Driscoll might have had gasoline is found in her written statement to MCSO investigators three days after the May 10 incident. (Doc. No. 22-7 at PageID 240.) For the purposes of the present Motion, this allegation is disputed by each independent witness account of the incident as well as Driscoll's own account of the May 10 incident. The Court declines to accept Deputy Smiley's subjective recitation of the circumstances in this case. None of this is to suggest that Deputy Smiley would not have been justified in using any degree of force against Driscoll. Though, a reasonable juror viewing these facts in Driscoll's favor could find Deputy Smiley's use of *deadly* force unwarranted.

Therefore, the Court finds sufficient evidence of a constitutional violation to deny Deputy Smiley qualified immunity on this ground.

### b. <u>Clearly Established Right</u>

Deputy Smiley would still be entitled to qualified immunity if her constitutional violation did not run afoul of Driscoll's clearly established rights. Defendants argue as much. (Doc. No. 24 at PageID 268.) In particular, Defendants argue Deputy Smiley could not have reasonably been aware that shooting Driscoll would violate his clearly established right because there is no precedent specifically analyzing an officer's use of force when the officer believed a person to be

in possession of gasoline. (*Id.* at PageID 268-69.) In retort, Driscoll posits that Defendants call for an overly restrictive interpretation of the "clearly established" requirement. (Doc. No. 29 at PageID 298-99.)

The Court agrees with Driscoll. For a right to be clearly established, "existing precedent—either controlling authority or a 'robust consensus of cases of persuasive authority'—must have placed the constitutional question 'beyond debate.'" *Stewart*, 970 F.3d at 674 (quoting *Latits v. Phillips*, 878 F.3d 541, 552 (6th Cir. 2017)). Where a plaintiff makes a claim of excessive force, a highly generalized constitutional standard against excessive force will not suffice to clearly establish the plaintiff's right. *Graham*, 490 U.S. at 394 (citing *Garner*, 471 U.S. at 7-22). Notwithstanding, "'it is axiomatic that individuals have a clearly established right not to be shot absent probable cause to believe that [they] pose[] a threat of serious physical harm.'" *Palma*, 27 F.4th at 443 (quoting *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015)). The Supreme Court defined this clearly established right in 1985, stating, "[a] police officer may not seize an unarmed nondangerous suspect by shooting him dead." *Garner*, 471 U.S. at 11.

Here, Driscoll was such an unarmed nondangerous suspect. In is undisputed that Driscoll was not in possession of any weapons when Deputy Smiley made the choice to shoot him. Further, the Court has just found a genuine dispute of material fact as to whether Driscoll was dangerous and whether Deputy Smiley reasonably believed Driscoll to have some sort of weapon. Nevertheless, although she did not kill Driscoll, Deputy Smiley still used lethal force to neutralize him. Ultimately, the Court finds that the constitutional right allegedly violated by Deputy Smiley's use of force was clearly established.

With that, the Court **DENIES** Deputy Smiley's plea for qualified immunity with respect to Driscoll's claims of excessive force.

## 2. **Free Exercise**

The Court now trains its focus on Driscoll's claim that Defendants violated his free exercise rights under the First Amendment of the United States Constitution. In their Motion, Defendants simply argue that Driscoll has failed to even state a claim for violation of his right to freely exercise his religion. (Doc. No. 24 at PageID 269.) Whereas Driscoll argues—despite the contention that he has failed to state a claim—that Defendants interfered with his religious exercise when Deputy Smiley subjected him to a Fourth Amendment seizure. (Doc. No. 29 at PageID 299-300.) Driscoll alleges that the loud noises he was making at Possum Creek MetroPark on May 10, 2020, were prayers. (Doc. No. 29-1 at PageID 304-05.) He reckons that because he was praying when Deputy Smiley seized him, she necessarily interfered with his protected First Amendment activity. (Doc. No. 29 at PageID 299-300.)

"The Constitution requires that the government commit 'itself to religious tolerance.'" *Meriwether v. Hartop*, 992 F.3d 492, 512 (6th Cir. 2021) (quoting *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rights Comm'n*, 584 U.S. 617, 638 (2018)). Regarding one's right to free exercise of religion, no government actor may "impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece*, 584 U.S. at 638.

The Court does not need to contemplate the First Amendment any further to dispatch Driscoll's free exercise claim as a matter of law. For his claim to survive, Driscoll would have to at least allege that Deputy Smiley's actions toward him during the May 10 incident were hostile or otherwise derogatory with respect to his religious practice. The Court accepts that Driscoll's noises were in-fact his prayers. More importantly, the Court respects the sanctity of Driscoll's right to pray in whatever way he sees fit. However, there is no version of the facts in this case

21

which would suggest that Deputy Smiley even knew Driscoll was praying, much less that she showed his religiosity some form of hostility under color of law.  Accordingly, the Court **GRANTS** Defendants' Motion with respect to Driscoll's free exercise claim, Count III of the Complaint.

### 3.  *Monell* Liability

The last of Driscoll's federal claims at issue in the current Motion pertain to the County's liability for Deputy Smiley's alleged constitutional violations against Driscoll.  (Doc. No. 24 at PageID 269-70.)  Driscoll has alleged that the County both failed to train its officers and maintained unconstitutional customs or policies, which resulted in Deputy Smiley's violation of Driscoll's constitutional rights.  (Doc. No. 1 at PageID 6-8.)  In total, Defendants assert that Driscoll has failed to provide evidence of either constitutional shortcoming, sufficient to hold the County liable for Deputy Smiley's allegedly unconstitutional actions under 42 U.S.C. § 1983.  (Doc. No. 24 at PageID 269-70.)  Conversely, Driscoll argues that the County improperly ratified Deputy Smiley's unconstitutional conduct.  (Doc. No. 29 at PageID 300-01.)  Moreover, Driscoll insists MCSO's inadequate handling of Deputy Smiley's investigation here demonstrates a clear unconstitutional policy or custom.  (*Id.* at PageID 301-02.)  However, Driscoll does not address the County's training of its officers, except to bemoan the fact that Defendants have argued for the efficacy of the County's officer training.  (*Id.* at PageID 301.)

To frame this debate, the Supreme Court set the baseline for when municipalities may be held liable for the constitutional violations committed by municipal employees in *Monell*.  436 U.S. at 694-95.  There, the high court concluded:

> that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may

fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id.* at 694. Developing the theory of municipal liability, courts have interpreted *Monell* to allow for claims against municipalities under § 1983 based on unconstitutional policies or customs, and, based on a municipality's failure to train its employees. *See e.g.*, *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-89 (1989) (failure to train); *see also Pineda v. Hamilton Cnty., Ohio*, 977 F.3d 483, 494 (6th Cir. 2020) (citing *Bd. of Cnty. Comm'rs. Of Bryan Cnty., Oklahoma v. Brown*, 520 U.S. 397, 403-405 (1997)) (custom or policy).

In this regard, the Court first finds that Driscoll's attempt to hold the County liable under § 1983 for a failure to train must fall. A failure to train or supervise claim requires plaintiffs to prove: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citing *Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992)); *see also Goodwin c. City of Painsville*, No. 1:10 CV 02883, 2014 WL 11515373, at *10 (N.D. Ohio Jan 13, 2014), aff'd, 781 F.3d 314 (6th Cir. 2015) (citing *Harvey v. Campbell Cnty., Tenn.*, 453 F. App'x. 557, 566 (6th Cir. 2011)) ("It is the plaintiff['s] burden to demonstrate that training was inadequate").

At present, there is no evidence that MCSO or the County provided Deputy Smiley with inadequate training or supervision.[3] To the contrary, the evidence indicates that the MCSO issued

---

[3] Driscoll argues that neither Deputy Smiley nor MCSO investigators heeded written policy because they did not mention specific policy provisions when investigating the May 10 incident involving Driscoll. (Doc. No. 29 at PageID 301-02.) However, Driscoll only evidences his assertion by referring to Defendants' Exhibit 6, a copy of MCSO policy on handling persons with mental illness (*see* Doc. No. 22-6). (Doc. No. 29 at PageID 301-02.) This exhibit does not support Driscoll's contention and, again, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp.*, 889 F.2d at 111.

Deputy Smiley various written policies for proper conduct and has required her to complete a good deal of training over the years. (*See* Doc. Nos. 22-2 – 22-6.) Even assuming Deputy Smiley's improper use of force—as the Court must here—the absence of any inadequacy in the MCSO's training regimen is fatal to Driscoll's claim for failure to train or supervise. Therefore, the Court **GRANTS** Defendants' Motion with respect to Driscoll's failure to train claim, Count V of the Complaint.

Regarding the constitutionality of the County's policies or customs, Driscoll's arguments fare no better. Generally, a municipal body's custom of inadequate internal investigation may constitute the ratification of illegal acts committed by a municipal employee and subject the municipality to *Monell* liability. *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1248 (6th Cir. 1989) (citing *Marchese v. Lucas*, 758 F.2d 181, 188 (6th Cir. 1985)). Nevertheless, "an allegation of a *single* failure to investigate will not suffice." *Pineda*, 977 F.3d at 495 (citing *Burgess v. Fisher*, 735 F.3d 462, 478-79 (6th Cir. 2013); *Thomas v. City of Chattanooga*, 398 F.3d 426, 433-34 (6th Cir. 2005)) (*emphasis in original*). In this vein, "'a claim based on an inadequate investigation' requires 'not only an inadequate investigation in this instance,' but also 'a clear and persistent pattern of violations' in earlier instances." *Pineda*, 977 F.3d at 495 (quoting *David v. City of Bellevue*, 706 F. App'x. 847, 853 (6th Cir. 2017)). Here, assuming the MCSO investigation into Deputy Smiley's actions was inadequate, any alleged ratification by the County appears to be a singular incident. There is no evidence of a persistent pattern. As such, Driscoll's claim of unconstitutional policy or custom fails as a matter of law and the Court **GRANTS** Defendants' Motion insofar as it states such a claim.

### 2. **State Law Claims**

Before discussing Driscoll's state law claims in earnest, the Court must find that Sheriff Streck is improperly named as a defendant to those state law claims. The Court's assessment with respect to Sheriff Streck is the same as with its reasoning given above on Driscoll's § 1983 claim for excessive force. Sheriff Streck did not, in his personal capacity, shoot Driscoll or cause Deputy Smiley to do so. Therefore, the Court **GRANTS** Defendants' Motion to the extent that Driscoll's allegations under state law target Sheriff Streck.

The Court must also find that Driscoll's state law claims fail to the extent they are levied against the County. Ohio law provides that, subject to exceptions, "a political subdivision is not liable … in a civil action …" for "any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." Ohio Rev. Code § 2744.02(A)(1). Per statute, a governmental function is pertinently defined as "[t]he provision or nonprovision of police … services or protection." Ohio Rev. Code. § 2744.01(C)(2). There is no dispute that the County is a political subdivision, nor that Deputy Smiley was providing police services when she encountered Driscoll on May 10, 2020. Moreover, Driscoll does not point to an applicable statutory exception that would make his state law claims against the County viable and the Court finds none. In all, the Court is convinced that it must **GRANT** Defendants' Motion on Driscoll's state law claims inasmuch as they assert the County's liability.

Again, the Court reaches a different result on Driscoll's claims arising under state law, as applied to Deputy Smiley in her personal capacity. Those claims are concisely stated as false arrest (Count VI), battery (Count VII), and intentional infliction of emotional distress (Count VIII). (Doc. No. 1 at PageID 8-9.) In Ohio, police officers typically enjoy broad statutory immunity unless the officer has acted outside the scope of her duties of inflicted injury "with malicious

purpose, in bad faith, or in a wanton or reckless manner."  Ohio Rev. Code § 2744.03(A)(6).

However, when a defendant has asserted qualified immunity under federal claims, the defendant's

claim to statutory immunity will "stand[] or fall[] with their federal qualified immunity defense."

*Hopper v. Phil Plummer*, 887 F.3d 744, 760 (6th Cir. 2018) (citation omitted).  In their Motion,

Defendants argue as much, only they presumed that Deputy Smiley would prevail on the issue of

qualified immunity.  (Doc. No. 24 at PageID 271.)  She has not and the Court finds that each of

Plaintiff's three state law claims stems from Deputy Smiley's use of force against Driscoll on May

10, 2020.  Consequently, viewing the facts in Driscoll's favor, Deputy Smiley is not entitled to

statutory immunity as a matter of law any more than she is entitled to qualified immunity, as set

forth above.

### IV.  CONCLUSION

Based on the foregoing, the Court **GRANTS**, **IN PART**, and **DENIES**, **IN PART**,

Defendants' Motion for Summary Judgment (Doc. No. 24).  Defendants' Motion is **DENIED** with

respect to Driscoll's federal claim for excessive force and his state law claims for false arrest,

battery, and intentional infliction of emotional distress against Deputy Smiley in her personal

capacity.  Defendants' Motion is **GRANTED** in all other respects and the Court finds as follows:

1. Counts I and II of the Complaint are hereby **DISMISSED** with respect to all defendants, with the exception of Deputy Smiley in her personal capacity;

2. Counts III through V of the Complaint are hereby **DISMISSED** in their entirety; and,

3. Counts VI through VIII of the Complaint are hereby **DISMISSED** with respect to all defendants, with the exception of Deputy Smiley in her

personal capacity.

**DONE** and **ORDERED** in Dayton, Ohio, this Tuesday, November 12, 2024.

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE